## Chillisquaque Creek Watershed Association
### v. Sanitary Water Board.

Argued May 5, 1971, before President Judge Bow-MAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MANDERINO, MENCER and ROGERS.

*John D. Killian*, with him *Killian & Gephart*, for appellants.

*Allen B. Zerfoss,* Assistant Attorney General, with him *William M. Gross,* Assistant Attorney General, and *J. Shane Creamer,* Attorney General, for appellee Sanitary Water Board.

*Gennaro D. Caliendo,* with him *Vincent Butler,* for intervening appellee.

OPINION BY JUDGE WILKINSON, August 2, 1971:

This is an appeal from the adjudication of the Sanitary Water Board, predecessor of the Environmental Hearing Board, overruling appellants' objections to the issuance to intervening appellee of a permit to discharge industrial waste from its proposed steam electric station into Chillisquaque Creek and directing the issuance of a permit when the Department of Environmental Resources is satisfied that intervening appellee has complied with all requirements of appropriate State governmental agencies relating to flood control. The permit was later issued, qualified by 16 standard conditions and seven special conditions.

The appeal is based on three basic propositions:

1. Granting this permit was an abuse of discretion by the Board without first establishing specific water quality criteria for Chillisquaque Creek;

2. Quantity as well as quality of the discharge should have been and was not considered by the Board;

3. Sufficient studies have not been made on which to issue a permit.

We cannot agree with the appellants' position and, therefore, must dismiss this appeal.

Appellants do not direct us to any statutory requirement or court decision requiring the Board to establish specific water quality criteria prior to issuing a permit and we find none. Appellants state that such action is an abuse of the Board's discretion. A careful review of the record satisfies us that, while appellants had

competent evidence contra, there was more than ample competent evidence to support the Board's third finding of fact that the discharge will meet applicable standards.

Appellants' second point is simply factually inaccurate, from the record, from the adjudication, and, most importantly, from the special conditions of the permit. In the record and under the law as it existed at the time of the hearing, there was some confusion as to whether the Sanitary Water Board should concern itself with the possibility of flooding. In fact, it did concern itself with this most important aspect. The question of jurisdiction is now moot—under the new law, the Environmental Hearing Board has complete control. Act of December 3, 1970, P. L.   , Act 275, §1921-A.(b), 71 P.S. 510-21. In this instance, the Sanitary Water Board, in its fourth finding of fact, found as a fact that the quantity of the discharge would not adversely affect the quality of the receiving waters. Finally, on the matter of flooding, special conditions provide that intervening appellee must conduct a study of possible flooding and if the study shows any adverse effects, including adverse effects on agricultural drainage, level of the water table, accessibility of stream crossings, etc., prompt steps are required to correct any such adverse effect.

Appellants' last argument is equally without merit. It is true that if there were more time for studies, the permit could be issued with fewer than 23 conditions, one of which includes conducting continuing studies. However, these conditions more than cover all the doubts that appellants would have removed by studies. Indeed, one special condition requires that within six months, intervening appellee must submit to the Pennsylvania Department of Environmental Resources evidence of the efficiency and adequacy of the treatment,

and if the treatment fails to meet all requirements, prompt measures must be taken to insure that the requirements will be met.

No good purpose would be served by here citing the long line of cases requiring our approval of an administrative board's action when such action is based on competent evidence and does not constitute an abuse of discretion. The rationale of this line of cases is discussed at length by Chief Justice STERN in *Blumenschein v. Pittsburgh Housing Authority*, 379 Pa. 566, 109 A. 2d 331 (1954). Appellants do not contest this doctrine and appropriately do not cite a single case to support their position. This case turns entirely on the record of testimony offered which we find to more than amply justify the grant of the qualified permit here issued.

Appeal dismissed.

———

DISSENTING OPINION BY JUDGE KRAMER:

I respectfully dissent. This is not the usual stream pollution case wherein an industrial user of water withdraws water from a nearby stream or from a source on his property and thereafter returns this water to its original source. This is a case where the industrial user is piping and transporting large volumes of water (about 14 million gallons per day) great distances from the Susquehanna River, and after using this water is discharging same into the Chillisquaque Creek, which has a normal flow of about six million gallons per day. Such discharge results in tripling the present water flow volume in the Chillisquaque Creek.

The Sanitary Water Board freely admits that it has not established specific water quality criteria for the waters of the Chillisquaque Creek basin. It gives as its reason for not establishing such criteria, the lack of employees and funds to make such a study to establish

such criteria. Instead, the Board utilizes its general criteria which it has established for all of the waters of the Commonwealth.

Generally, from a reading of this record, it is the observation of this writer that once the PP&L triples the water volume of this creek without the Board first having developed criteria for this creek, it will no longer be possible for the Board to determine whether PP&L has changed the quality of the waters of this creek. This is a far cry from the position of the Board in its many other cases where it charges citizens with polluting streams because any additional foreign matter is discharged into a stream of this Commonwealth.

This writer has no objection to the discharge by PP&L of its waters into this stream so long as it is proven that the waters to be discharged will not unreasonably change the quality and the use and the quantity of the waters of this creek and thereby violate the statutory protection provided. No one has established that fact to the satisfaction of this writer in this record.

If the Board is implying in its position in this case that *after* PP&L establishes the proposed discharge, and after it has invested great sums of money to put this water operation into effect, the Board can thereafter order PP&L to stop the operation of its plant, then such a result is either manifestly unfair to PP&L, or the Board has lost sight of the practical result of what it believes its powers to be. PP&L has the right to know that once it expends great sums of money in commencement of its operations, it will be in full compliance with what the Board believes to be the proper standards.

The conditions set by the Board in this case are far too general and vague for either PP&L or the public. For example, in Standard Condition No. 7, the Board

talks about requiring PP&L to upgrade its treatment to meet any new standard of treatment imposed by the Board. In Condition No. 16, PP&L will be directed to treat waters in such a manner as will be satisfactory to the Board at all times. In Special Condition No. F., PP&L will have to provide adequate crossings to facilitate normal farm access. In Special Condition No. G., PP&L will be subject to correct any impairment of agricultural drainage occasioned by its discharge. This writer finds that these conditions are far too general and are indicative of a vagueness which pervades the sixteen General Conditions, seven Special Conditions and three Qualifications contained in the Board's adjudication.

The attempt by a regulatory agency to establish standards by which a citizen is to be guided in the operation of his business while simultaneously acting to protect public rights, necessitates clarity and specificity in those very standards. They must be comprehensible to the average reader. Anything less should not be countenanced by a reviewing court. Anything less merely plants seeds for future controversy, often with resultant unfairness either to the regulated citizen or the public.

I would remand this case to the Board with directions that a specific study of Chillisquaque Creek be made so as to establish its present quality and quantity, and, further, to establish specific water quality criteria for the Chillisquaque Creek basin. It is only with such a study and companion criteria that the Board can properly render an adjudication which will be fair to PP&L and to the public.

Judge MANDERINO joins in this dissent.